IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Department of Labor and Industry, :
                Petitioner :
                 :
          v. :
                 :
Unemployment Compensation :
Board of Review, : No. 390 C.D. 2025
          Respondent : Submitted: April 13, 2026

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge
              HONORABLE STACY WALLACE, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON                 FILED: May 8, 2026


The Department of Labor and Industry (Department) petitions for review of the February 28, 2025, order of the Unemployment Compensation (UC) Board of Review (Board). The Board reversed a May 10, 2024, referee's order that had deemed Kimberly Bauer (Claimant), a former Department employee, ineligible for UC benefits. Upon review, we reverse the Board's order.


## I. Factual and Procedural Background

On December 5, 2023, Claimant applied online for UC benefits. Certified Record (C.R.) at 3.[1] She asserted that she resigned from her employment with the Department on December 4, 2023, for personal reasons. *Id.* at 10 & 12. In an application questionnaire, Claimant wrote that she attempted to maintain the

---

[1] Certified Record (C.R.) references are to electronic pagination.

employment relationship but ultimately decided she "needed to leave and find a less mentally taxing job." *Id*. at 29. The record includes Claimant's December 5, 2023, email to the Department notifying her supervisors of her decision to resign. *Id*. at 41-42. Claimant stated in the email that she hoped to retain her "chances for rehire in the future" but needed "to take time to reset and better her mental health." *Id*. In a December 17, 2023, follow-up UC application questionnaire, Claimant explained that she resigned because she could "no longer deal with the mental anguish" of the job after being denied a promotion and "punished" for things that her supervisors would not explain when she asked about them. *Id*. at 48-49.

On January 17, 2024, the UC Service Center issued an initial determination denying benefits because Claimant's application indicated that she left for personal rather than work-related reasons. C.R. at 53. Claimant timely appealed, asserting that she did everything she could to maintain the employment relationship, including asking for assistance and clarification of her "alleged issues" so that she could address them and speaking with management to understand the reason she was not promoted. *Id*. at 68. She added that she was "called out" multiple times in team meetings for "things that could not be validated and told I was being punished," and then it became a "hostile work environment with my supervisor who did nothing to help me when I asked for it." *Id*. at 69.

A referee conducted an in-person hearing on May 8, 2024. C.R. at 109. Claimant, who appeared *pro se*, stated that she began working full time for the Department as an intake interviewer in September 2022, although the date was later corrected to August 2022. *Id*. at 117 & 126. She worked three weeks of each month from home and one week of each month in the office. *Id*. at 117. The work involved taking calls from UC claimants, helping them open and reopen claims, and

2

answering their questions. *Id*. She began as a temporary employee but became permanent in October 2022. *Id*. at 118. In addition to calls, she handled chat emails and "special projects" like monetary investigations regarding claimants' wage figures; she described the job as tough and difficult. *Id*. at 118 & 120. In October or November of 2023, she unsuccessfully applied for a promotion to an available "examiner" position that paid more and involved examining already-filed claims and helping make determinations on those claims. *Id*. at 119. One of her supervisors, Nora Anderson, told her it was based on seniority and she was just below the people who got the job; she planned to apply again when promotions opened up again, usually every few months, and acknowledged that she would probably be "near the top of the list" when that happened. *Id*. at 119 & 125. She understood why she was not promoted but characterized it as "a little bit of a setback for me." *Id*.

Claimant testified that shortly after the unsuccessful promotion application, she began feeling that one of her supervisors, Tom Arner, was singling her out for criticism at her group's weekly online team meetings, where roughly 5 to 10 interviewers participated. C.R. at 120. Arner pointed out at least twice during meetings in late November 2023 that Claimant was exceeding her after-call time, which is for wrap-up tasks and duties after each call, and that she would be punished for it. *Id*. at 120 & 122. The usual rule was that after-call work should take about 10% of the length of the call. *Id*. at 121. Claimant said that she was the only person that Arner called out for this issue. *Id*. at 121.

Claimant acknowledged that she once forgot to change her status in the system when she went into a meeting right after she finished a call, so it looked as though she had exceeded the recommended after-call timespan. *Id*. at 120-21. Other than that, she normally messaged a supervisor if her after-call time was going to take

3

longer than normal, so she did not understand why she was being reprimanded and threatened with punishment at the meetings. She asked Arner for specifics and he told her he was going to ask another supervisor about it, but she never heard back from either of them. *Id*. at 121-22. Soon, her time on special projects was reduced and she was given more time on the phones, but this was not presented to her as formal discipline or a demotion. *Id*. at 123 & 126. She felt wrongly singled out at the meetings about the after-call time issue and wished Arner had spoken to her separately and privately. *Id*. at 123. She did not believe she needed more training on time management because she was only trying to find out what incidents Arner was referring to in the meetings. *Id*. at 126.

Claimant had not been with the Department for long and believed that a challenge to Arner's conduct would not go well for her if it was her word against his, so she did not talk to a higher-level supervisor, human resources, or her union representatives. C.R. at 122-24. At that point, she began to feel like the job was too mentally taxing for her. *Id*. at 124. She did not have any personal leave days or health insurance at the time and believed that without a medical or mental health diagnosis, asking for a leave of absence would be futile. *Id*. at 124-25. She stated that she loved her job and had hoped to be there for a long time until these setbacks occurred in late 2023. *Id*. at 125. As of the May 2024 hearing, she had not found another job. *Id*.

The Department, represented at the hearing by counsel, presented Nora Anderson as a witness. Anderson testified that Claimant had been "excellent" at her job and received a commendation in February 2023 for helping an applicant. C.R. at 127 & 129-30. Claimant never came to Anderson with any issues and was not under disciplinary or performance improvement conditions before resigning. *Id*. at

4

128 & 130-31. Claimant never told Anderson of any problems with her schedule or that she felt singled out by superiors for criticism and punishment. *Id*. at 129-30. Anderson confirmed that Claimant asked her about the promotion and that she told Claimant it was based on seniority. *Id*. at 128-29. Anderson stated that Claimant could have been a promotion candidate next time if her seniority fit the requirements. *Id*. at 129.

Anderson testified that scheduling for interviewers was based on operational needs and that if the phone queue got high, interviewers across the state would be taken off of special projects and added to the phone team. C.R. at 131 & 136. After-call time was based on the needs of each call, but if an interviewer needed more than about five minutes after a call, management would want to know if the interviewer needed help. *Id*. Anderson recalled that when she learned Claimant was resigning, she asked why, and Claimant responded that she was leaving to raise her young child at home. *Id*. at 130.

Arner testified for the Department that phones are a key requirement of the job and that the goal is to keep calls and after-call time short so that as many calls as possible can be taken. C.R. at 132. He acknowledged that this was brought up regularly in meetings but denied singling Claimant out or telling her she would be punished for taking too long after calls. *Id*. at 132 & 134. Claimant never came to him with any problems, but he would have helped her if she had done so. *Id*. at 133-34. He denied that Claimant asked him for specific examples of when her after-call work time was too long. *Id*. at 135. He also denied changing her work schedule to include more phone days as punishment for alleged issues with her after-call work time. *Id*. at 133.

5

During Arner's testimony, Department counsel entered into evidence a set of charts showing weekly schedules for the interviewers as of November 23, 2023. C.R. at 133; *see also id*. at 19-25. Arner stated that the Department provided these set schedules showing which days interviewers were assigned to phone calls and which days they were assigned to other tasks such as chats or special projects. *Id*. at 133. He pointed out on the schedule that some interviewers were assigned to work the phones every day while Claimant was scheduled for phones only three days per week with the two other days on chats or special projects. *Id*.

Claimant resumed testimony in rebuttal, stating that she had a two-year-old daughter but that did not affect her ability to work. C.R. at 135. She reiterated that there was only 1 occasion when her after-call time went long and that most days she took over 20 calls during her shift. *Id*. She loved her job and did not mind working the phones but her decision to resign was because of "a combination of a lot of things at that time." *Id*. at 136. The hearing ended thereafter. *Id*. at 137.

On May 10, 2024, the referee issued his decision crediting the Department's witnesses over Claimant and affirming the UC Service Center's initial determination that Claimant was ineligible for benefits. C.R. at 141-42. Claimant timely appealed to the Board, asserting that the referee wrongly concluded that her issues pertained to being given more phone time, which was not why she resigned; rather, she resigned because she was "told multiple times in multiple meetings that [she] was being punished," even though she handled more calls than any other interviewer. *Id*. at 152-53. Appearing to refer to Arner, she averred that her supervisor lied to the referee about what happened in the team meetings. *Id*. She lamented that because the meetings are not recorded, she cannot prove her allegations against him and that her co-workers would not come forward to support

6

her because they still worked there. *Id*. She stated that the supervisors never told the interviewers that they could seek help or accommodations, and that she did not seek medical help or leave because she could not afford health insurance and had no time off to request. *Id*. She added that she had since been diagnosed with anxiety disorder and post-traumatic stress disorder that she attributed to her experience at this job. *Id*.

The Board reversed the referee's decision and granted benefits in a February 28, 2025, decision. C.R. at 164-66. The Board denied the Department's request for reconsideration and the Department timely appealed to this Court. *Id*. at 181. This matter is now ripe for disposition.[2]

## II. Issues

The Department lodges two claims. First, the Department asserts that Claimant failed to establish a necessitous and compelling cause for her voluntary resignation. Dep't Br. at 9-17. Next, the Department claims that the Board capriciously disregarded substantial evidence that rebutted and undermined Claimant's credibility. *Id*. at 19-22.

## III. Discussion

In the UC context, the Board is the ultimate fact finder and has exclusive power to resolve conflicts in the evidence and to decide witness credibility

---

[2] The Department sent its petition for review to Claimant with a notice advising her to seek intervention if she intended to participate in this appeal. *See* Notice to Participate attached to Petition for Review. Claimant has not filed anything with this Court expressing an intent to intervene or participate.

and the weight to be accorded to evidence.[3] *Wise v. Unemployment Comp. Bd. of Rev.*, 111 A.3d 1256, 1261-62 (Pa. Cmwlth. 2015). The Board may override a referee's credibility determinations without providing a full explanation when there is conflicting testimony. *Oliver v. Unemployment Comp. Bd. of Rev.*, 5 A.3d 432, 439-40 (Pa. Cmwlth. 2010); *see also Unemployment Comp. Bd. of Rev. v. Wright*, 347 A.2d 328, 329 (Pa. Cmwlth. 1975) (concluding that the Board need not give special weight to referee's credibility determinations). On appeal, this Court must accept the Board's credibility determinations. *See McCarthy v. Unemployment Comp. Bd. of Rev.*, 829 A.2d 1266 (Pa. Cmwlth. 2003). We may not reweigh the evidence but must examine it in the light most favorable to the prevailing party and give that party the benefit of all inferences that can be logically and reasonably drawn from the testimony. *Wise*, 111 A.3d at 1262.

Whether an employee has cause to voluntarily quit employment is a question of law fully reviewable by this Court. *Id*. at 661. *Brunswick Hotel & Conf. Ctr, LLC v. Unemployment Comp. Bd. of Rev.*, 906 A.2d 657, 661 (Pa. Cmwlth. 2006). Generally, voluntary resignation renders an employee ineligible for unemployment compensation benefits under Section 402(b) of the UC Law.[4] *Wise*, 111 A.3d at 1261. There is an exception in Section 402(b) if the employee resigns for cause of a necessitous or compelling nature. *Id*. Although the Law does not define the terms "necessitous and compelling," case law has done so. *Brunswick Hotel*, 906 A.2d at 660. The employee must prove that: (1) circumstances existed

---

[3] Our review is limited to determining whether constitutional rights were violated, an error of law was committed or whether necessary findings of fact are supported by substantial competent evidence. *Wise v. Unemployment Comp. Bd. of Rev.*, 111 A.3d 1256, 1261 n.5 (Pa. Cmwlth. 2015).

[4] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b).

8

which produced real and substantial pressure to terminate employment; (2) such circumstances would compel a reasonable person to act in the same manner; (3) the claimant acted with ordinary common sense; and (4) the claimant made a reasonable effort to preserve her employment. *Id.* "[E]ach case must be examined under its own attendant circumstances." *Id.* at 661.

An employer's imposition of a substantial unilateral change in the terms of employment may constitute cause for an employee to resign, but mere dissatisfaction with working conditions does not constitute cause for resignation. *Id.* at 660. Similarly, "[p]ersonality conflicts, absent an intolerable work atmosphere, do not amount to a necessitous and compelling cause for leaving one's employment." *Indiana Univ. of Pa. v. Unemployment Comp. Bd. of Rev.*, 202 A.3d 195, 204 (Pa. Cmwlth. 2019). An employer's unjust accusations may produce sufficient pressure to terminate employment that would compel a reasonable person to act, but only if connected with sufficient negative alterations to the claimant's work duties or environment. *See, e.g.*, *id.* at 204-05 (benefits awarded to employee subjected in the presence of other workers to unjust allegations about her trustworthiness, barred from her office, and relocated to a different building with insufficient supplies and equipment).

Regarding the first three test elements, which concern the work environment and its impact on the claimant, in *First Federal Savings Bank v. Unemployment Compensation Board of Review*, 957 A.2d 811 (Pa. Cmwlth. 2008), the claimant established that she was wrongly shouted at, reprimanded, and disciplined in a meeting with other personnel present and that she spoke with managers about those issues several times without effect. *Id.* at 816-17. There is no "specific number" of unjust accusations that may constitute a valid reason to resign;

9

if egregious enough, a single incident may be sufficient, as may the potential "forecast of continuing accusations and suspicions and absence of confidence and trust" in the work relationship. *Sol Neft Sports v. Unemployment Comp. Bd. of Rev.*, 610 A.2d 539, 540-41 (Pa. Cmwlth. 1992) (claimant granted benefits based on credited allegations of unjust accusations of dishonesty resulting in punitive measures after testifying against employer in criminal proceedings). However, while each case is to be considered on its own facts and there are no bright lines in this inquiry, this Court has awarded benefits in cases where claimants have met their burden because they were "faced with a situation with no foreseeable resolution" other than resignation. *Craighead-Jenkins v. Unemployment Comp. Bd. of Rev.*, 796 A.2d 1031, n.5 (Pa. Cmwlth. 2002) (distinguishing denial of benefits in that case with, *inter alia*, *Sol Neft Sports*, where burden was met).

Here, the Board credited Claimant's testimony that she was subjected to "scrutiny" regarding her after-call time and that when she asked for particulars and guidance, her supervisors failed to respond but told her she would be punished and then assigned her to increased phone duties. C.R. at 165. The Department argues that this testimony established only that Claimant was dissatisfied with her working environment and that her issues were little more than "normal workplace strains" and "personality conflicts" that did not rise to the level of valid reasons to resign. Dep't Br. at 10-12. The Department adds that Claimant failed to cite facts or circumstances that a reasonable person would view as a basis for resigning, such as severe mistreatment, harassment, or fundamental changes in her job conditions. *Id.* at 13-14. The Board responds that Claimant's credible testimony established cause for her resignation because Arner's conduct in singling her out for unfounded

10

criticism followed by reassigning her to increased phone duty as punishment created a real and substantial pressure on her to resign. Board Br. at 12-14.

Some aspects of the record favor Claimant's version of the events. In her resignation email, she specifically referred to her need to "take time to reset and better [her] mental health." C.R. at 41-42. In application questionnaires, Claimant stated that she had to "leave and find a less mentally taxing job" and that she could "no longer deal with the mental anguish" of the job after being denied a promotion and "punished" for things that her supervisors would not explain when she asked about them. *Id*. at 29 & 48-49. She cited similar reasons in her appeal from the UC Service Center's initial denial. *Id*. at 68-69. At the hearing, she testified that Arner singled her out at more than one meeting for criticism about her after-call time and told her she would be punished for it. *Id*. at 120 & 122. She believed she had followed the Department's policies about after-call time except for one instance where she did not actually exceed the time but just forgot to change her status in the system when she went into a meeting. *Id*. at 120-21. When she asked Arner for clarification, he told her he would talk to another supervisor about the issue, but she never heard back from him or anyone else. *Id*. at 122. She was then given more phone time, which she did not mind but perceived as punishment because it lessened time that she was previously assigned to special projects. *Id*. at 123 & 126. Claimant also testified that she had a young daughter but that had not affected her ability to work or been the reason she resigned. *Id*. at 135.

However, even accepting the Board's crediting of Claimant's testimony over that of the Department's witnesses, this is a question of law and the Board's characterization of this case fails in several regards. Claimant's UC application did not cite work reasons for her resignation but stated that it was for personal reasons.

11

C.R. at 10 & 12. Her resignation email similarly did not indicate any specific work incidents or reasons. *Id*. at 41-42. In her testimony, she acknowledged that the promotion she did not get was due to seniority reasons rather than poor performance. *Id*. at 119 & 125. Even in her concluding testimony, she did not reiterate that the reason she resigned was due solely to Arner's treatment or other work-specific reasons, but rather, that it was due to "a combination of a lot of things at that time." *Id*. at 137. Unlike the claimants in *First Federal*, *East Wheatfield Township*, and *Sol Neft Sports*, Claimant did not aver that she was shouted at or accused of criminality or wrongdoing in the meetings. She also conceded that she did not mind being assigned extra phone time despite her assertion that it was assigned as punishment. *Id*. at 136.

Under the circumstances, the record here did not support the Board's determination that Arner's conduct towards Claimant created real and substantial pressure that she could not resolve other than by resigning. By Claimant's accounting, she was reprimanded in meetings for after-call time management. This differs significantly, however, from cases where claimants have been shouted at or wrongfully accused of misconduct or outright criminality. *See Indiana Univ. of Pa.*, 202 A.3d at 204-05 (collecting cases, including *Sol Neft Sports*); *First Fed. Sav. Bank*, 957 A.2d at 816-17. Similarly, Employer's alleged change to Claimant's work circumstances, assigning her to more phone time, was not obviously punitive as in *Indiana University of Pennsylvania*, where the claimant was banished from her office and sent to a vacant area without equipment or supplies. 202 A.3d at 199. In fact, Claimant testified that she did not mind working the phones even though she viewed it as punitive because it took her away from special tasks that she may have enjoyed more. C.R. at 136.

12

Other than Arner's alleged admonishments during meetings and the reassignment to more phone time, which alone do not meet Claimant's burden, the record does not support the Board's position that Claimant established an intolerable work atmosphere. She acknowledged that she was not promoted due to lack of seniority rather than any improper reason and that other promotions would likely have been within her reach in several months. C.R. at 119 & 125. She maintained that Arner's statements were unwarranted because at least once, her after-call time only appeared to have gone long because she forgot to change her status in the system. *Id*. at 120-21. However, she did not state that she explained that to Arner when she spoke to him. *Id*. She did not testify that her encounter with Arner became hostile, only that he told her he would follow up with her but failed to do so. *Id*. at 121-22. To quote *Craighead-Jenkins* and *Sol Neft Sports*, Claimant failed to present "a situation with no foreseeable resolution" or a "forecast of continuing accusations and suspicions and absence of confidence and trust." As such, Claimant has not met the first three elements of the test set forth in *Brunswick Hotel*.

The fourth element of the test, which entails whether Claimant made a reasonable effort to maintain her job, focuses on slightly different facts. The requirement may be relaxed or even excused if the claimant establishes a reasonable belief that such efforts would be futile. *Mauro v. Unemployment Comp. Bd. of Rev.*, 751 A.2d 276, 280 (Pa. Cmwlth. 2000). However, if the record reflects that no effort is made at all by the claimant, this element will not be met. *See Stiffler v. Unemployment Comp. Bd. of Rev.*, 438 A.2d 1058, 1060 (Pa. Cmwlth. 1982).

In *First Federal*, we agreed with the Board that the claimant's efforts on "various occasions" to "attempt to communicate her concerns" to the employer were sufficient. Recently, in *East Wheatfield Township v. Unemployment*

13

*Compensation Board of Review* (Pa. Cmwlth., No. 35 C.D. 2024, filed Aug. 22, 2025), 2025 WL 2426912 (unpublished),[5] we agreed with the Board that further efforts by the claimant would have been futile because the only person the claimant could have reported her issues to was the same individual who was the cause of her reasonable belief that her work environment had become intolerable.

Here, the Board concluded that Claimant's discussion with Arner, after which he failed to follow up with her, constituted a reasonable effort to address her concerns and preserve the employment relationship before resigning. C.R. at 165. The Department disagrees, pointing out that Claimant asked Arner for clarification only once and did not pursue it when he failed to follow up with her, did not ask any other superiors for assistance or report her belief that she was singled out and punished, and did not cite any work-related reasons in her resignation email other than that she needed to take time off for a mental health reset and hoped to return in the future. Dep't Br. at 14-17.

The record includes Claimant's testimony that she spoke up when she believed it would be fruitful, as when she asked Anderson about the promotion and learned that it was seniority-based and that she would likely be a candidate when promotions were next available. C.R. at 119 & 125. Similarly, after Arner's reprimand and announcement of punishment in meetings, Claimant asked him for clarification based on her belief that his treatment of her was unwarranted. *Id*. at 121-22. He told her that he would discuss it with another supervisor, but nobody

---

[5] This Court's unreported memorandum opinions filed after January 15, 2008, may be cited "for [their] persuasive value, but not as binding precedent." Section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

ever responded to her request, and then she was assigned to increased phone time. *Id*. at 122-23.

However, the record also includes Claimant's testimony that she did not do more to maintain her job because she believed it would be futile. She did not directly report Arner's treatment of her to other superiors, human resources, or the union because she had not been with the Department for long and felt it would come down to her word against his as her direct supervisor, which she believed would be unlikely to work out for her. C.R. at 124-25. Similarly, she testified that she had no personal days or health insurance at the time to obtain mental health treatment or a diagnosis, so she believed that seeking accommodations or a leave of absence would be unsuccessful. *Id*.

This case is different from *First Federal Savings*, where the claimant made several efforts to speak with her superiors. Here, after the meetings, Claimant knew that Arner had issues with her after-call time usage. To her credit, she brought it up with him once but did not claim that she explained to him that in at least one instance, she did not exceed her after-call time but simply forgot to change her status in the system when she switched over to a meeting. C.R. at 120-21. She also did not state that he reacted with hostility in that encounter; rather, he told her he would discuss it with other supervisors and follow up with her. *Id*. at 121-22. When he failed to do so, she did not follow up with him. *See id*.

This case is also different from *East Wheatfield Township*, where the only person the claimant could have reported her issues to was the person who created her difficulties in the work environment. Here, Claimant testified that she felt escalation to other individuals would be useless because it would be the word of a relatively new employee against that of a supervisor. C.R. at 122-24. She also

15

testified that she did not feel she could bring her work-related mental health concerns to her superiors without a medical diagnosis or available leave time. *Id*. at 124-25. These unilateral perceptions may have been understandable, but they were not necessarily reasonable in a legal sense because she did not indicate that she or anyone else had been treated unfairly before by human resources or management in these or similar work issues.

Moreover, as a union member, Claimant had direct access to on-site representatives who knew and understood the work environment and the participants, and whose role to support and advocate for employees did not depend on the workplace's immediate authority figures. Claimant did not assert that the union or its representatives were ineffective or had expressed hostility or indifference to her. This Court, tasked with the legal question whether Claimant made reasonable efforts to preserve her work relationship, simply cannot view as reasonable her conscious decision to forego reporting her concerns to, at the least, her labor representatives.

As such, Claimant has not met the fourth element of the test set forth in *Brunswick Hotel*. Therefore, the record does not support the Board's determination that Claimant presented necessitous and compelling reasons to resign such that benefits were warranted.[6]

---

[6] Because we reverse on this issue, we need not reach the Department's second claim that the Board capriciously disregarded evidence that undermined Claimant's case. We note briefly, however, that this claim lacks merit. Even if record evidence exists that could support a contrary conclusion, that does not mean that the Board's findings of fact are not supported by substantial evidence. *Tran v. Unemployment Comp. Bd. of Rev.*, 348 A.3d 371, 380 (Pa. Cmwlth. 2025). Here, the Department points to its witnesses' testimony, which the Board was within its authority to reject. *Wise*, 111 A.3d at 1261-62. The Department also asserts that the Board ignored its charts showing that Claimant was not punished after the incidents with Arner because she was assigned to "only" three days per week of phone time while other workers were assigned to phone time on

## IV. Conclusion

In light of the foregoing, the Board's February 28, 2025, order reversing the referee and granting Claimant UC benefits is reversed.

_____
CHRISTINE FIZZANO CANNON, Judge

---

all five workdays. However, the charts did not refute Claimant's testimony that Arner's treatment in meetings precipitated her resignation. As such, the Department did not present "overwhelming and unavoidable" evidence of its position. *Id.* at 1262-63. Because the Board's findings were supported by the record, it did not capriciously disregard evidence. *Id.* Nevertheless, as discussed above, the Board's findings did not support its legal conclusion that Claimant established necessitous and compelling reasons for her resignation. *Id.* at 1264.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Department of Labor and Industry,   :
                    Petitioner   :
                          :
        v.   :
                          :
Unemployment Compensation   :
Board of Review,   :   No. 390 C.D. 2025
                 Respondent   :

# **O R D E R**

AND NOW, this 8th day of May, 2026, the February 28, 2025, order of the Unemployment Compensation Board of Review granting unemployment compensation benefits to Kimberly Bauer, Claimant herein, is REVERSED.

_____
CHRISTINE FIZZANO CANNON, Judge